**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **KERRI PEREIRA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **16-11855-FDS** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND**
**DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security

Administration ("SSA") denying Kerri Pereira's application for Social Security Disability

Income ("SSDI") benefits. The Commissioner denied the application, finding that Pereira was

not disabled within the meaning of the Social Security Act during the relevant period.

Pereira appeals the Commissioner's decision on the grounds that the decision was not

supported by substantial evidence pursuant to 42 U.S.C. § 405(g) and was erroneous as a matter

of law. Specifically, she contends (1) that the Administrative Law Judge ("ALJ") erroneously

determined her physical residual functional capacity ("RFC") by making a lay assessment that

was not supported by evidence from an acceptable medical source; (2) that the ALJ erroneously

ignored medical evidence when determining her physical RFC; and (3) that the ALJ relied on

insufficiently detailed evidence when determining her mental RFC. She further contends that

those errors invalidate the independent vocational expert's analyses on which the ALJ relied in

determining whether there were other jobs existing in significant numbers in the national

economy.

Pending before the Court are Pereira's motion to reverse the decision of the Commissioner and the Commissioner's motion to affirm her decision. For the reasons stated below, the decision of the ALJ will be affirmed.

I.      **Background**

Kerri Pereira was 39 years old in 2012, the date that she was last insured. (A.R. 615, 616).[1] She is a high-school graduate and has worked as a short-order cook and in a salon. (A.R. 213, 214, 381). She did not work from May 1, 2011, the date of her alleged onset, through her last insured date of December 31, 2012. (A.R. 442).[2]

Pereira claims total disability stemming from back pain, overweight status post-gastric-bypass surgery, depressive and anxiety disorders, and post-traumatic stress disorder. (A.R. 443). She also claims disability because of abdominal pain, hernias, and urinary tract infections. (*Id.*). Among other things, she claims to suffer diarrhea for three to four hours after eating. (*Id.*).

A.      **Medical History**

In November 2009, Pereira underwent gastric-bypass surgery. (A.R. 269).

In April 2011, Estella Moriarty assessed Pereira's psychological health. (A.R. 328-39). Moriarty observed that Pereira was withdrawn, nervous, and anxious; depressed with flat affect; and had difficulties communicating effectively, but had normal appearance, eye contact, speech, thoughts, intelligence, memory, insight, and judgment. (A.R. 333). She noted that Pereira had anxiety with panic attacks and post-traumatic stress disorder symptoms, depression with

---

[1] To be eligible for SSDI benefits, a claimant must be "insured for disability" at the time she became disabled. A claimant is insured for disability in any quarter in which she was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period . . . ending with that quarter." 20 C.F.R. § 404.130(b). Based on Pereira's earnings record, she last met the SSDI insured status requirement on December 31, 2012. Thus, she had to show that she was disabled as of that date to qualify for SSDI benefits.

[2] She has worked since that time, claiming earnings in 2014 of $792.34. (A.R. 620).

irritability, low motivation, poor coping skills, and mood swings. (A.R. 335). Pereira reported trauma ten years earlier when her best friend murdered another friend then killed himself. (A.R. 336-37). Moriarty diagnosed her with post-traumatic stress disorder and depressive disorder. (A.R. 338).

In July 2011, Pereira saw LiLi Huang, M.D., at the Lahey Clinic. (A.R. 359-68). Pereira reported tiredness, arthralgias, anxiety, emotional problems, and heartburn. (A.R. 361). She reported she did not have pain in her eyes, chest, ears, abdominals, and pelvis, nor did she have diarrhea, dizziness, confusion, suicidal thoughts, or sleep disturbances. (*Id.*). She also reported a recent flare of depression. (A.R. 364). Dr. Huang noted that she was doing very well after the gastric bypass and that she had a gastroesophageal reflux disorder that was under control with medication. (A.R. 364). Dr. Huang also noted that she reported chronic abdominal pain but had a negative work-up, with a normal upper GI with small bowel follow-through. (A.R. 365). Pereira also reported a recent back-pain episode associated with muscle spasm, and Dr. Huang advised her to avoid heavy lifting. (A.R. 364, 367).

In August 2011, Pereira attended a psychopharmacology intake meeting with Julie Larson, RNCS. (A.R. 346). Pereira reported depression and anxiety with low energy and motivation but stated that she functioned adequately, including cooking and cleaning, although she worried about everything. (A.R. 347). Larson diagnosed post-traumatic stress disorder and depressive disorder and prescribed Prozac and Trazodone. (*Id.*).[3]

On September 3, 2011, Pereira presented to Addison Gilbert Hospital in Gloucester, Massachusetts with abdominal pain, nausea, and diarrhea. (A.R. 316). She reported a mild pain that became increasingly severe, with a severity of 10/10 at its peak. (*Id.*). A CT scan showed a

---

[3] Prozac and Trazodone are both antidepressants. *See* https://www.drugs.com/prozac.html; https://www.drugs.com/trazodone.html.

dilated loop of the small bowel and a large amount of stool in the right colon.  (A.R. 320).

Within the next twenty-four hours, her pain had resolved completely and she was discharged.

(*Id.*).

Pereira also saw Dr. Huang in September 2011, who noted the episode of abdominal pain

that required her to go to the emergency room, and another episode shortly thereafter.  (A.R.

356).  Pereira reported that since those two episodes she had experienced no more abdominal

pain and was doing well.  (*Id.*).

Pereira next saw Dr. Huang in January 2012, who noted that she was doing well after the

gastric bypass and had done well after a hernia repair the previous year.  (A.R. 353).  Dr. Huang

also noted that Pereira had symptoms of depression, but that she was doing well with medication.

(*Id.*).

Also in January 2012, Pereira saw Annette Kawecki, M.D., at the Lahey Clinic.  Pereira

reported that she felt less anxious and overwhelmed, but had trouble sleeping.  (A.R. 381).  She

reported that she wanted to start working out now that her son was in daycare in the morning and

she had more time for herself.  (*Id.*).  She reported that her children were her life and that she

was very happy in her role as a mother and homemaker.  (*Id.*).  Dr. Kawecki noted she was alert,

oriented, and less anxious with improved range of affect; had a euthymic mood; did not have

psychosis; and had intact insight, judgment, cognition, and memory, although she had recurrent

depression in early remission and generalized anxiety.  (*Id.*).

Pereira saw Dr. Kawecki again in March 2012 and reported that she was less anxious and

sleeping well.  (A.R. 378).  She reported that she had had abdominal hernias in the past and felt

like they were coming back again.  (*Id.*).  She also reported that she wanted to start working out

with a trainer and obtain additional schooling.  (*Id.*).  Dr. Kawecki noted she was alert, oriented,

and a little anxious with a slightly reduced range of affect, but otherwise open and comfortable talking, and that her thoughts were organized. (*Id.*). Dr. Kawecki diagnosed generalized anxiety and chronic post-traumatic stress disorder, and prescribed sertraline and zolpidem. (*Id.*).[4]

In June 2012, Pereira saw physician assistant Ashley Drapeau at the Lahey Clinic. She reported that she was doing well and exercised every other day for two hours. (A.R. 421). She also reported back pain and a skin rash resulting from post-gastric bypass excess skin, but denied abdominal pain and diarrhea. (A.R. 421-22).[5]

In August 2012, Pereira met with dietician Kelly Barnaby, R.D. She reported that she had occasional constipation and diarrhea, and that her diarrhea was caused by ingesting milk. (A.R. 415).

In December 2012, Pereira saw nurse-practitioner Pamela O'Brien for a three-year gastric-bypass follow-up and reported no issues. (A.R. 736). She stated she went to the gym every day for at least two hours, felt well, and had no complaints. (*Id.*). O'Brien reported there were no abnormal abdominal symptoms. (*Id.*). The same day, she reported to a dietician that she suffered diarrhea when she drank milk. (A.R. 745).

Also in December 2012, at her last medical examination before her date last insured, Pereira saw Karl D'Silva, M.D., concerning a potential genetic predisposition for hemochromatosis. (A.R. 723). She denied pain, weakness, depression, anxiety, diarrhea, abdominal pain, depression, and anxiety. (A.R. 724).

---

[4] Sertraline is an antidepressant and Zolpidem is a sedative prescribed to facilitate sleep. *See* https://www.drugs.com/sertraline.html; https://www.drugs.com/zolpidem.html.

[5] Also in June 2012, Lisa Krikorian, a nurse-practitioner, noted that Pereira was a well-appearing female sitting comfortably on the exam table with no distress. (A.R. 420).

## B.    Disability Determination Explanations

Pereira was evaluated twice for disability benefits, once at the initial level and at the reconsideration level.  (A.R.  60, 69).  At both evaluations, Pereira claimed disability due to depression and post-traumatic stress disorder.  (A.R. 60).

On September 22, 2011, state-agency consultant Mary Ellen Menken, Ph.D., conducted an initial evaluation.  Dr. Menken opined that Pereira had concentration and persistence limitations and was moderately limited in carrying out detailed instructions and maintaining attention and concentration for long periods.  (A.R. 64-65).  Despite those limitations, Dr. Menken found that she retained the capacity to sustain attention, persistence, and pace adequately to perform simple tasks for two-hour periods during the course of a normal workday and workweek.  (*Id*.).  Dr. Menken opined that she had social-interaction limitations and was moderately limited in her ability to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers and peers without distracting them or exhibiting behavioral extremes.  (A.R. 65).  Despite those social limitations, Dr. Menken found that she retained the capacity to manage basic, work-related social interactions with supervisors and coworkers adequately.  (*Id.*).  Dr. Menken also opined that she had adaptation limitations and that she was moderately limited in her ability to respond appropriately to changes in the work setting, although she retained the capacity to respond appropriately to simple, routine changes.  (A.R. 66).

In January 2012, state-agency consultant Steven Fischer, Psy.D., performed a mental residual functional capacity assessment.  (A.R. 69).  Dr. Fischer noted there had been no changes since the previous disability report, and that Pereira did not allege that any of her symptoms had worsened.  (A.R. 72).  He opined that her severe anxiety and affective disorders caused mild

limitations in activities of daily life, moderate limitations in social functioning, and moderate limitations in maintaining concentration, persistence and pace, and that she had no episodes of decompensation of extended duration.  (A.R. 73-76).  He further opined that she could carry out simple instructions in a normal workday or workweek, could interact around work-related issues, and could adapt to routine stressors.  (A.R. 75-76).  Finally, he opined that she did not have the RFC to perform her previous work, and was limited to unskilled work because of her mental impairments.  (A.R. 76).

### C.     Pereira's Statements

In July 2011, Pereira completed a self-evaluation form that detailed how her illnesses, injuries, or conditions limited her activities.  (A.R. 218).  She reported that she lived in an apartment with her family, cat, and children.  (*Id.*).  She stated that from the time she woke up until she went to bed, she took care of her children and performs household chores.  (A.R. 218-19).  She was able to prepare her own meals, but her cooking habits have changed since her onset date.  (A.R. 220).  She cleaned all day, every day, and her husband helped with a lot of the household chores.  (*Id.*).  She shopped, drove, and tried to go outside every day.  (A.R. 221).  She did not indicate any physical problems, such as lifting, standing, walking, or sitting, but she did state that she had problems with memory, completing tasks, concentration, and getting along with others.  (A.R. 223).

At the first hearing in November 2012, Pereira testified that she had trouble with anxiety, staying focused, and getting tasks done on time, but that medication helped sometimes.  (A.R. 37, 39-40).  She also stated that she had back pain that went into her leg approximately twice per month.  (A.R. 42-43).  She testified that she cannot lift heavy objects comfortably; that the largest amount she can lift comfortably is approximately five pounds; that sitting was

uncomfortable; and that she had trouble reaching and using a keyboard. (A.R. 44-45). She had

not been prescribed pain medication and testified to taking over-the-counter medications to help

with her back pain as needed. (A.R. 50). She testified that she drove her son to school every

day, had no hobbies, watched television during the day, and did laundry. (A.R. 37-43).

At the second hearing in August 2015, Pereira testified that she had abdominal problems

since her gastric-bypass surgery and suffered from severe diarrhea 30 to 45 minutes after eating

that lasted for three hours. (A.R. 482). She testified that she drove her son to school, did laundry

and other household chores, shopped for groceries, and played games on her iPad. (A.R. 468,

472-73).

### D.   Disability Hearings

Pereira filed an application for SSDI, alleging a disability beginning on May 1, 2011.

(A.R. 60). After her application was denied initially, and on reconsideration, the ALJ held a

hearing, at which Pereira and a vocational expert testified. (A.R. 26-59). On December 12,

2012, the ALJ issued a decision finding that Pereira was not disabled from her alleged onset date

through the date of the decision. (A.R. 8-19). The Appeals Council denied her request for

review. (A.R. 1-3). She then appealed to this Court. (A.R. 550).

On October 9, 2014, this Court remanded the case to the Appeals Council. (A.R. 548).

A month later, the Appeals Council remanded the case to the ALJ. (A.R. 509-12). The ALJ held

a second hearing, at which Pereira and a vocational expert testified. (A.R 456-501). On

September 24, 2015, the ALJ found that Pereira was not disabled within the meaning of the

Social Security Act from her alleged onset date of May 1, 2011, through December 31, 2012, her

date last insured for disability benefits. (A.R. 437-51). On July 12, 2016, the Appeals Council

declined to assume jurisdiction, making the ALJ's September 2015 decision the Commissioner's

final decision, subject to judicial review.  (A.R. 427-29).

## II.      Legal Standard

### A.      Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Secretary of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Secretary of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).  The ALJ's findings of fact are not conclusive when derived by ignoring evidence, misapplying the law, or making expert findings of fact.  *See Da Rosa v. Secretary of Health & Human Servs.,* 803 F.2d 24, 26 (1st Cir. 1986) (*per curiam*).

In applying the "substantial evidence" standard, the reviewing court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Commissioner of Soc. Sec.*, 114 Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards, and found facts based on the proper quantum of evidence."  *Ward v. Commissioner of Soc. Sec.*, 211

F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue, are reviewed *de novo*. *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

**B.      Standard for Entitlement to Disability Benefits**

In order to qualify for disability benefits, a claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").

If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in that national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's RFC in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

## III. Analysis

### A. The Administrative Law Judge's Findings

The ALJ followed the five-part analysis called for by the regulations to determine whether plaintiff had been under a disability from the alleged disability onset date through the date of decision. *See* 20 C.F.R § 404.1520.

At step one, the ALJ found that Pereira did not engage in substantial gainful activity from her alleged onset date through her date last insured. (A.R. 442).

At step two, the ALJ found that, through her date last insured, Pereira had the following severe impairments: back pain, overweight status post-gastric-bypass surgery, depressive and anxiety disorders, and post-traumatic stress disorder. (*Id.*). Pereira claimed that her back pain and overweight status post-gastric-bypass were totally disabling, but the ALJ found that the evidence did not support her contentions. (A.R. 447). The ALJ also found that Pereira had other

medically determinable impairments that could not be considered severe, including abdominal

pain, hernias, gastroesophageal reflux disease ("GERD"), and urinary tract infections. (A.R.

443).

At step three, the ALJ found that, through her date last insured, Pereira did not have an

impairment or a combination of impairments that met or medically equalled any of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (*Id.*).

The ALJ then found that Pereira retained the RFC to perform light work, except that she

should avoid crawling and climbing ropes, ladders, and scaffolds; was limited to no more than

simple, routine, three to four-step tasks involving no more than occasional decision-making and

work setting changes; was limited to no more than occasional interaction with the public; and

could be around coworkers, but could only occasionally work with them and should avoid

tandem tasks. (A.R. 446).[6]

At step four, the ALJ found that Pereira was unable to perform any past relevant work.

(A.R. 449).

At step five, the ALJ also found that, considering her age, education, work experience,

and residual functional capacity, there were jobs existing in significant numbers in the national

economy that Pereira could perform through her date last insured. (*Id.*). That determination was

based upon her RFC to perform light work and the opinion of a vocational expert, who

determined that she could work in representative occupations. (*Id.*). The ALJ asked the

vocational expert to assume a person of plaintiff's age, education, work experience, who was

limited to light work with no climbing of ladders or crawling, simple routine tasks of three or

---

[6] "Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objecting weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

four steps, occasional decision-making, occasional changes in work setting, occasional interaction with the public, who could be around coworkers but only have occasional interaction with no tandem tasks. (A.R. 446). The vocational expert testified that such an individual could not perform any of Pereira's past work, but could perform the jobs of cleaner, sub-assembler, and office helper, which existed in significant numbers in the local and national economies. (*Id.*; A.R. 450).

Accordingly, the ALJ found that Pereira was not disabled within the meaning of the Social Security Act from her alleged onset date through her last date insured. (A.R. 450).

### B.     <u>Plaintiff's Objections</u>

As noted, Pereira contends that (1) that the Administrative Law Judge ("ALJ") erroneously determined her physical residual functional capacity ("RFC") by making a lay assessment that was not supported by evidence from an acceptable medical source; (2) that the ALJ erroneously ignored medical evidence when determining her physical RFC; and (3) that the ALJ relied on insufficiently detailed evidence when determining her mental RFC. She further contends that those errors invalidate the independent vocational expert's analyses on which the ALJ relied in determining whether there were other jobs existing in significant numbers in the national economy.

### 1.     <u>There Was No Error in the ALJ's Physical RFC Finding</u>

Pereira first contends that the ALJ erroneously based her physical RFC finding on her own lay opinion, not supported by substantial evidence.

### a.     <u>The Burden Is on the Claimant</u>

As a preliminary matter, the claimant has the burden of providing evidence to establish how her impairments limit her RFC. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be

considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."); *Puleio v. Colvin,* 2015 WL 5722731, at *11 (D. Mass. Sept. 29, 2015) (quoting *Freeman*, 274 F.3d at 608); *Gordils v. Secretary of Health & Human Servs.*, 921 F.2d 327, 328-329 (1st Cir. 1990). The ALJ must determine a claimant's RFC based upon the entire record. *See* 20 C.F.R. §§ 404.1545, 404.1546. In assessing an RFC, the ALJ can "piece together the relevant medical facts from the findings and opinions of multiple physicians." *See Evangelista*, 826 F.2d at 144.

Pereira did not allege physical impairments during her initial RFC disability evaluation or in her RFC evaluation on reconsideration. (A.R. 60, 69-70). In her July 2011 report, she did not assert any physical problems or limitations at all. (A.R. 223).

The medical evidence of physical impairment is sparse. Although Pereira reported arthralgia and an episode of back pain in July 2011, Dr. Huang did not note any objective physical abnormalities and simply cautioned her against heavy lifting. (A.R. 361-67). In September 2011 and again in January 2012, she did not report any physical pain or limitations to Dr. Huang. (A.R. 353-55, 356-58). In June 2012, she reported to Drapeau that she exercised every other day for two hours. (A.R. 421). Although she reported discomfort related to her excess abdominal skin, Drapeau did not note any physical abnormalities. (A.R. 421-23). She reported unspecified joint pain to Dr. Huang in September 2012, but he did not note any physical abnormalities or limitations. (A.R. 398-402). In December 2012, she denied having pain or myalgia to Dr. D'Silva, who observed normal gait and spine tenderness. (A.R. 723).

Pereira had the burden to produce evidence of physical impairments as they relate to her residual functional capacity. *See Puleio,* 2015 WL 5722731, at *11 (citing *Freeman*, 274 F.3d at 608). In the absence of any reported physical limitations, there is no reason to believe that a

physical RFC is necessary. *See Perez v. Secretary of Health and Human Servs.*, 958 F.2d 445, 446-47 (1st Cir. 1991) (affirming physical RFC finding for light work in the absence of medical evaluation of plaintiff's physical RFC where ALJ noted there was no evidence that the claimant had any exertional limitations for the performance of work activities and that treatment records did not reveal that treating physicians considered symptoms or condition to be so severe as to require more intensive treatment); *Gordils*, 921 F.2d at 329 (affirming physical RFC finding where ALJ found plaintiff could perform light work, relying on non-evaluating physician's report that did not include functional conclusions and found no objective evidence of disabling impairment beyond the observation that plaintiff likely has a "weaker back"). Here, there was no physical RFC evaluation because Pereira only alleged post-traumatic stress disorder and depression, not physical impairments, during her disability-determination examinations. *See Gordils*, 921 F.2d at 329.

### b. The ALJ Did Not Need to Rely on an Expert RFC Evaluation

On her disability application, Pereira alleged physical disability arising from back pain, abdominal pain, hernias, gastric bypass, and urinary tract infections. (A.R. 203, 218, 447). She reported that the back pain, abdominal pain, and other symptoms caused a totally disabling difficulty, which prevented her from performing even sedentary work between the onset date and her date last insured. (A.R. 446). Despite those reported ailments, the objective medical evidence presented normal findings during physical examinations, including a lack of spinal tenderness and normal strength, sensation, and gait. (A.R. 293, 352, 354, 356, 364, 389, 401, 421-22, 710, 725, 736).

Although the treatment records show a history of reported back pain, the objective neurological findings and musculoskeletal findings were normal, showing no spinal tenderness,

normal station, normal stability, and no prescribed medications.  (A.R. 293, 352, 354, 356, 364, 389, 401, 421-22, 710, 725, 736-737).  The only medical opinion as to Pereira's back pain was in July 2011, when Dr. Huang opined that Pereira ought to avoid heavy lifting.  (A.R. 364, 367). The ALJ's RFC findings reflect that evidence.  (A.R. 448).[7]  The ALJ noted that other than Dr. Huang's opinion, the medical record contained no detailed medical opinion from treating or examining sources as to Pereira's physical functioning abilities and limitations through the date last insured.  (*Id.*).

Pereira's treatment records also repeatedly indicated that she was doing well following her gastric bypass surgery, and despite her reported impairments, she admitted to performing a variety of activities, such as doing laundry, cooking every day, going to the gym, driving her son to and from school every day, and taking care of her cat.  (A.R. 218, 221, 293, 356, 364, 389, 401, 421-22).  Notwithstanding two incidents of abdominal pain in 2011, which both resolved within 24 hours, Dr. Huang noted that she was doing well post-gastric bypass.  (316, 320, 356). In January 2012, Dr. Huang again noted that she was doing well after the gastric bypass and had done well after a hernia repair the previous year.  (A.R. 353).  In June 2012, Pereira reported to physician assistant Ashley Drapeau at the Lahey Clinic that she was doing well and exercised every other day for two hours.  (A.R. 421).  She reported back pain and a skin rash resulting from excess skin, but denied abdominal pain and diarrhea.  (A.R. 421-22).   In December 2012, Pereira saw nurse practitioner Pamela O'Brien for a three-year gastric-bypass follow-up and reported no issues.  (A.R. 736).  At that time, she reported that she went to the gym every day for at least two hours, felt well, and had no complaints.  (*Id.*).  O'Brien noted there were no abnormal abdominal symptoms.  (*Id.*).

---

[7] The ALJ noted that she had given Dr. Huang's opinion significant weight in light of Pereira's history of back pain and being overweight.  (A.R. 448).

While it is true that no physical RFC evaluation was performed, such an evaluation was not required under the circumstances.  *See Perez*, 958 F.2d at 446-47; *Gordils*, 921 F.2d at 329.  "Where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render commonsense judgment about functional capacity even without a physician's assessment," as long as the ALJ does not overstep the bounds of a lay person's competence and render a medical judgment.  *Manso-Pizarro*, 76 F.3d at 17; *see Gordils*, 921 F.2d at 329 ("[A] finding that claimant does not suffer from any impairment posing severe or significant *exertional* restrictions would obviate the need for a medical assessment of exertional residual functional capacity.").

Here, repeated objective tests showed little physical impairment.  (A.R. 218, 221, 293, 356, 364, 389, 401, 421-22).  When weighed against Pereira's reports that she was still able to perform an array of activities (such as taking care of her children, pets, household chores, driving, cooking, and shopping), the ALJ concluded that she would be able to handle light work.  *See Perez*, 958 F.2d at 446-47.  The ALJ was able to account for the functional limitations resulting from Pereira's physical impairments because the medical evidence showed relatively little impairment.  *See Perez*, 958 F.2d at 446-47; *Gordils*, 921 F.2d at 328-329.

  c.  <u>**Substantial Evidence Supports the Physical RFC Finding**</u>

Again, under the "substantial evidence" standard, the decision of the ALJ should be upheld if a "reasonable mind," reviewing the evidence in the record as a whole, could "accept [it] as adequate to support a conclusion."  *Miranda v. Secretary of Health, Ed. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 232 (D. Mass. 2011).  The ALJ must review all the relevant evidence.  *Sousa*, 514 F.2d at 232.  However, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision.  *Id.* at 234

("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record.").  It is not within the purview of the reviewing court to evaluate the credibility of plaintiff's testimony, nor to weigh it against the ALJ's findings; it is sufficient that substantial evidence exists that could support those findings.  *See Howard v. Colvin*, 54 F. Supp. 3d 109, 117, 120 (D. Mass. 2014) (finding substantial evidence in the record where ALJ considered evidence from multiple sources and explained in detail the reasons for affording certain sources more weight than others).

Here, the medical evidence repeatedly reflects normal neurological and musculoskeletal results.  *See Gordils*, 921 F.2d at 329.  The ALJ addressed those findings in her report and explained that the longitudinal medical evidence did not support Pereira's subjective allegations of totally disabling back pain and gastric-bypass-related symptoms.  *See Howard*, 54 F. Supp. 3d at 120; *Perez*, 958 F.2d at 446-6.  Moreover, the ALJ, in relying upon the opinion from Dr. Huang, took into account Pereira's back pain by limiting her to light work rather than withholding any physical RFC restriction.  *See Ortiz v. Colvin*, 2015 WL 4577106, at *8 (D. Mass. July 30, 2015) (rejecting the argument that the ALJ improperly made a lay interpretation of the evidence where the ALJ gave the claimant the benefit of the doubt and assessed an RFC more favorable than the State agency physicians' opinions); *Bowden v. Colvin*, 2014 WL 1664961, at *4 (D. Me. April 25, 2014) (finding claimant could not obtain remand on basis of RFC that was more favorable to claimant that the evidence would otherwise support).

In summary, the ALJ considered evidence from multiple sources, evaluated the record, and rendered a decision that was consistent with the evidence.  *See Howard*, 54 F. Supp. 3d at 120; *Perez*, 958 F.2d at 446-67 (finding substantial evidence that claimant could perform light work where there was no physical RFC evaluation but objective medical findings by at least two

doctors showed normal neurological results); *Gordils*, 921 F.2d at 329 (finding it permissible for the Secretary as a layman to conclude that a "weaker back cannot preclude sedentary work"). The ALJ's physical residual functional capacity determination is supported by substantial evidence and will be affirmed.

### 2. The ALJ Did Not Ignore Evidence of Physical Disability

Pereira next contends that the ALJ improperly ignored evidence of her diarrhea.

The ALJ found that Pereira's diarrhea was not severe. (A.R. 443). She noted that Pereira's own testimony and reports were inconsistent with the medical evidence. (*Id.*). She also noted that Pereira did not report to her physicians the same frequency of diarrhea as she alleged at the hearing. (*Id.*). Indeed, her reports to her medical-care providers were inconsistent. She denied having diarrhea in July 2011 to Dr. Huang. (A.R. 361). In June 2012, she denied having diarrhea to Drapeau. (A.R. 421). In August 2012, she reported having occasional diarrhea caused by milk. (A.R. 415). In December 2012, she denied having diarrhea. (A.R. 724). At the hearing, however, Pereira testified that she had abdominal problems since her gastric bypass surgery and suffered from severe diarrhea 30 to 45 minutes after eating that lasted for three hours every time she ate. (A.R. 482).

The ALJ determined that "the claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision." (A.R. 446). Furthermore, and in any event, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision. *Sousa*, 514 F.2d at 234 ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record."). In short, the ALJ adequately considered Pereira's reported diarrhea it in determining her RFC. *Puleio*, 2015 WL 5722731, at *11; *Dias v. Colvin*¸ 52 F. Supp. 3d 270,

286 (D. Mass. 2014).

### 3. There Was No Error in the ALJ's Mental RFC Finding

Pereira also contends that the ALJ's mental RFC findings were flawed because they (1) were not supported by substantial evidence, (2) improperly failed to include a *Lancellotta* analysis, and (3) improperly failed to give controlling weight to the summary conclusions of the RFC evaluation.

### a. Substantial Evidence Supports the Mental RFC Finding

Substantial evidence supports the ALJ's finding that Pereira could mentally perform simple, routine, three to four-step tasks involving no more than occasional decision-making and work-setting changes, and could have no more than occasional interaction with the general public, no more than occasional interaction with coworkers, and must avoid tandem tasks. *See Puleio*, 2015 WL 5722731, at *11; *Evangelista*, 826 F.2d at 141.

The ALJ found that Pereira only had mild-to-moderate restrictions in activities of daily life. (A.R. 444). As to social functioning, she found that Pereira had no more than moderate difficulties because of medical symptoms. (*Id.*). With regard to concentration, persistence, and pace, she found no more than moderate difficulties from mental symptoms. (A.R. 444).

There is substantial evidence in the record to support these findings. *See Puleio*, 2015 WL 5722731, at *11; *Evangelista*, 826 F.2d at 141. In April 2011, Moriarty observed that Pereira was withdrawn, nervous, anxious, and depressed, yet had normal thoughts, intelligence, memory, insight, and judgment. (A.R. 333). In August 2011, Pereira reported to Larson that she felt depressed and anxious but that she functioned adequately—including cooking and cleaning—even though she worried about everything. (A.R. 347). In January 2012, Dr. Kawecki reported that she was alert, oriented, and less anxious, with improved range of affect,

and a euthymic mood; she did not have psychosis; and she had intact insight, judgment, cognition and memory, despite recurrent depression and generalized anxiety.  (A.R. 381).  In March 2012, she reported to Dr. Kawecki that she was less anxious and sleeping well.  (A.R. 378).  Dr. Kawecki diagnosed chronic post-traumatic stress disorder and generalized anxiety, but again noted that she was alert, oriented, and a little anxious with a slightly reduced range of affect, but otherwise open and comfortable talking, and her thoughts were organized.  (*Id.*).

During the reconsideration RFC assessment, Dr. Fischer opined that Pereira would have moderate limitations in maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriate to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting.  (A.R. 74-76).  Despite those limitations, Dr. Fischer found that she retained the capacity to carry out simple instructions on a normal workday and workweek, interact around work-related issues, and adapt to routine stressors.  (*Id.*).

In reaching her mental RFC findings, the ALJ noted that Pereira reported and admitted to performing an array of activities that undermined her claim of total disability:  taking care of her children, household chores, taking care of pets, cooking, driving, shopping, being able to handle money, being able to follow instructions, driving her son around, laundry, using an iPad, using Facebook, paying bills, seeing her friend monthly, and helping her son with his homework.  (A.R. 444).  She found that Pereira's own testimony and treatment records reveal that she was doing well on medication at times.  (Id.).

"The resolution of conflicts in the evidence and the determination of the ultimate question of disability is for the [ALJ], not for . . . the courts." *Rodriguez*, 647 F.2d at 222. Here, the ALJ found that Pereira did not have totally disabling mental symptoms, as she reported, but rather varying moods and otherwise intact cognition. (A.R. 448). The ALJ based her mental RFC findings on the objective medical evidence, opinion evidence, testimonial evidence, and other evidence. (A.R. 446). Moreover, despite her mental impairments, the ALJ found that Pereira's reports about the activities she could perform undermined her contentions. (*Id.*). Thus, there is substantial evidence to support the ALJ's mental RFC finding. *See Puleio*, 2015 WL 5722731, at *11 (finding substantial evidence where ALJ relied upon professional observations, tests, opinions, and without discussing every single finding); *Dias*, 52 F. Supp. 3d at 286; *Evangelista*, 826 F.2d at 144.

### b. *Lancellotta* **Is Distinguishable**

Pereira further contends that because she claims limitations related to stress, the ALJ had an obligation to undertake at least some subjective, individualized inquiry into which job attributes are likely to produce disabling stress in her. She suggests that the ALJ, in identifying the conditions that are likely to cause her disabling stress, failed to elicit from the vocational expert any testimony directed specifically to her particular stress-causing conditions, thus requiring reversal under *Lancellotta v. Sec'y of Health and Human Servs.*, 806 F.2d 284, 285 (1st Cir. 1986).

In *Lancellotta*, the court reversed an ALJ's conclusion at the fifth step (requiring an analysis of whether jobs existed in the national market of which plaintiff could perform) where, "[i]n the absence of 'an evaluation of Lancellotta's vocational abilities in light of his anxiety disorder, there [was] no basis for the ALJ's conclusion that he can perform low stress work.'"

*Launer v. Colvin*, 2016 WL 775923, at *4 (S.D. Ind. Feb. 3, 2016) (quoting *Lancellotta*, 806

F.2d at 285–86) (second alteration in original). The ALJ had asked the vocational expert

whether the plaintiff could perform "non-stressful work," to which the vocational expert

answered "yes." *Lancellotta*, 806 F.2d at 285. The ALJ then asked how many jobs existed in

the national economy that are sedentary and "low stress in nature," and the vocational expert

indicated there were roughly 100,000 to 200,000 such jobs. *Id.* As a result, the ALJ found that

the plaintiff was not disabled. *Id.* The First Circuit found that the findings of the ALJ were not

based on substantial evidence because the ALJ made no findings on the nature of the plaintiff's

stress, the circumstances that trigger it, or how those factors affect his ability to work. *Id.* The

court noted that stress is not a characteristic of a job, but an internal reaction to external stimuli.

*Id.* Thus, even if most individuals would not find a job "particularly stressful," there was no

evidence that the plaintiff, who suffered from a severe mental impairment, would react the same

way. *Id.* Thus, an evaluation of plaintiff's vocational abilities in light of his anxiety disorder

was required. *Id.*

      Here, the ALJ did not merely frame Pereira's mental RFC in terms of ability to handle

stress, requiring "non-stressful work" or "low stress in nature." *See id.* Instead, the ALJ

specified that Pereira's limitations permitted her to perform simple, routine, three to four-step

tasks involving no more than occasional decision-making and changes in work setting. (A.R.

446). Unlike the situation in *Lancellotta*, the ALJ provided the vocational expert with

individualized limitations based on her review of the record. *See Justason v. Barnhart*, No. 05-

55, 2005 WL 3263934, at *5 (D. Me. Nov. 30, 2005) (finding materially distinguishable

differences from *Lancellotta* where ALJ defined the parameters of "low stress" as occasional

decision making, occasional changes in the work setting, and occasional exercises of judgment).

### c.    The Narrative Section of POMS Has Controlling Weight

Pereira next contends that the ALJ should have given controlling weight to the summary conclusions rather than the narrative section of the RFC evaluation.  *See Dias¸* 52 F. Supp. 3d at 286.  The Program Operations Manual System ("POMS") provides that a residual functioning capacity assessment consists of a written narrative, where physicians relay their opinions about a claimant's RFC.  The narrative portion is to be considered by the ALJ in formulating her RFC finding.  POMS § DI 25020.010(B)(1) ("Note").  The summary conclusions, on the other hand, are quick-and-easy "yes or no" questions that provide a worksheet to ensure that an examining physician has "considered each pertinent mental activity and the claimant's . . . degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis."  *Id.*

Here, Pereira asserts that the mental RFC opinions by Dr. Fischer were inconsistent, in that the summary conclusions evinced substantially more of a disability than the written narratives did, and accordingly Dr. Fischer's opinions should be ignored in light of these contradictions.  (Pl. Mem. at 7-8).  However, "[t]he ALJ is 'under no obligation to accept the 'check-box conclusions' found in Section I of the Mental RFC form.'"  *Dias*, 52 F. Supp. 3d at 286 (quoting *Pippen v. Astrue*, 2010 WL 3656002, at *6 (W.D.N.C. Aug. 24, 2010)).  Rather, "The criteria found in Section I of the form should be used to provide a more detailed assessment of RFC in Section III of the form."  *Id.*  Therefore, the ALJ still had sufficient evidence, even though when the non-examining physician "describe[ed] the effect of [Pereira's] limitations, the moderate limitations simply vanished."  (Pl. Mem. 7-8).

### 4.    The Vocational Expert's Testimony Was Valid

Finally, the hearing officer's finding at step five was not erroneous.  At step five, the

Commissioner bears the burden of proof. *Goodermote,* 690 F.2d at 7. The Commissioner is responsible for providing "evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] RFC and vocational factors." 20 C.F.R. § 404.1560(c)(2). Pereira's argument as to this issue hinges on her contention that the hearing officer's RFC analysis was flawed—but, as discussed above, this Court has ruled that the RFC analysis was appropriate. Accordingly, there was nothing wrong with the hypothetical questions the hearing officer posed to the vocational expert, and thus the vocational expert's testimony constitutes substantial evidence to support the hearing officer's finding at step five. *Szumylo v. Astrue,* 815 F. Supp. 2d 434, 441 (D. Mass. 2011). The hearing officer heard the vocational expert's testimony and found that there are jobs in significant number in this economy that Pereira can perform. (A.R. 54-58). Because the hearing officer's step five analysis is supported by substantial evidence, his finding must be upheld.

## II.     Conclusion

For the foregoing reasons, the motion of plaintiff Kerri Pereira to reverse the decision of the Commissioner is DENIED, and the motion of the Commissioner to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**


                                                        /s/ F. Dennis Saylor
                                                        F. Dennis Saylor IV
Dated:  August 17, 2017                                 United States District Judge